US DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FILED

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAN 0 8 2025

By_____
Ronald E. Dowling
Deputy Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS. | ) | No. 5:25cr50005-001-002 |
| | ) | |
| | ) | 18 U.S.C. § 1343 |
| JASON BOYD CARNEY and | ) | 18 U.S.C. § 1349 |
| LACEY CHRISTINA CARNEY | ) | 31 U.S.C. § 5324(a)(3) |

## INDICTMENT

The Grand Jury Charges:

## BACKGROUND

1.      Certain organizations, such as religious, charitable, or private foundations, may seek tax-exempt status from the Internal Revenue Service ("IRS") under Internal Revenue Code ("IRC") section 501(c)(3), which entitles them to benefits including exemption from paying federal income taxes and permitting donors to claim tax deductions for charitable contributions. In exchange, such organizations must operate exclusively for their exempt purpose, and none of their earnings may benefit private shareholders, interests, or individuals.

2.      Tax-exempt organizations obtaining annual gross receipts exceeding $50,000 must make annual filings, under penalty of perjury, on IRS Form 990. These filings detail the organization's financial information including expenses, revenues, compensation of officers, directors, and key employees. In addition, exempt organizations must disclose payments and gifts, called "excess benefits," to the organizations' officers, directors, and their family members. These forms are available on free and publicly accessible websites, including www.IRS.gov.

3.      Accurate disclosure of compensation and excess benefits is required for several reasons, to include allowing the public and IRS to monitor and assess the reasonableness of

1

employee compensation and for transparent accounting of the use of funds, which are often received from donors.

4.    Arkansas law requires a nonprofit organization's officers, including chief executive officers and chief financial officers, directors, and board members, to discharge their duties in good faith, with care, and in the best interest of the organization. Arkansas Code Annotated §§ 4-33-830 & 842.

## INTRODUCTION

5.    At all times relevant to this Indictment, unless otherwise set forth, with all dates and times alleged to be "on or about" and all amounts to be "approximately:"

6.    Beginning as early as January 2015, 2nd Milk, Inc. ("2nd Milk") was an organization incorporated under Arkansas law. 2nd Milk was granted tax-exempt status by the IRS under IRC Section 501(c)(3) by letter dated November 10, 2016.

7.    2nd Milk's application for tax-exempt status was signed by **JASON CARNEY** on October 13, 2016, and represented that 2nd Milk was a religious, charitable organization that would not pay compensation to any of its officers, directors, or trustees.

8.    2nd Milk's website, publicly available tax filings, and marketing materials identified **JASON CARNEY** as 2nd Milk's president, board chair, and chief executive officer ("CEO") and **LACEY CARNEY** as its chief financial officer ("CFO"), treasurer, and board member.

9.    A stated mission of 2nd Milk's was to "sav[e] the lives of malnourished and orphaned infants in Africa and around the globe" by providing nutrition and training, establishing farms, and sending children to schools.

10.    2nd Milk was funded by donations and child sponsorships, both of which it received through the 2nd Milk website, online fundraising platforms, and direct solicitation for cash and

gifts of stock.  Through these platforms and contact with 2nd Milk representatives, donors could indicate the purposes of donations, which included recurring gifts to 2nd Milk's general fund, specific building projects, infant or baby formula ("formula") purchases, and as sponsorships for specific children.

11.     The 2nd Milk website listed infants available to "sponsor," and each listing had a basic biography detailing an infant's weight, a picture, and the reason why the infant was available for sponsorship, such as the death of a parent or lack of resources to provide for the child.

12.     2nd Milk's website represented that "100% of the $2^{nd}$Milk sponsorships go directly to saving the lives of the most vulnerable babies living in developing countries."

13.     2nd Milk's domestic headquarters was located at 446 Angel Falls, Springdale, Arkansas, located in the Fayetteville Division of the Western District of Arkansas.  2nd Milk's charitable programs were primarily in the nation of Malawi.

14.     To fund its programs, 2nd Milk's Malawi-based staff sent budget requests to **JASON CARNEY**, detailing the amount of money sought to purchase formula and supplies such as fuel, office supplies, and other operating expenses ("Operations Budget").  These Operations Budget requests ranged from approximately $1,500 to $5,500 per month, not including Malawi-based staff salary expenses, which were usually less than the Operations Budget requests. Formula, milk, and porridge accounted for about 10-40% of the Operations Budget requests. **JASON CARNEY** sent operating funds to Malawi by wire transfer, by carrying cash during travel to Malawi, and by directing others to carry cash during travel to Malawi.

15.     In addition to supplying nutrition to children, 2nd Milk used donated funds to build facilities to distribute formula to children, "chicken houses," "piggeries," and dig water wells.

16.     2nd Milk caused the following information from its Form 990s to be made available to the public, advertising 2nd Milk's revenue, expenses, and the compensation of its officers, directors, and key employees:

| TAX YEAR | JASON CARNEY REPORTED COMPENSATION | LACEY CARNEY REPORTED COMPENSATION | 2nd MILK TOTAL REVENUE | "FORMULA & SUPPLIES" EXPENSES | LABOR EXPENSE | 2nd MILK TOTAL EXPENSES |
|---|---|---|---|---|---|---|
| 2016 | $0 | $0 | $240,209 | $184,608 | $3,650 | $236,677 |
| 2017 | $0 | $0 | $485,714 | $380,402 | $48,000 | $455,969 |
| 2018 | $0 | $0 | $239,465 | $244,435 | $6,207 | $276,163 |
| 2019 | $0 | $0 | $419,076 | $342,425 | $36,219 | $419,238 |
| 2020 | $64,000 | $0 | $342,463 | $243,031 | | $341,394 |
| 2021 | $13,400 | $0 | $644,387 | $546,396 | | $626,699 |
| 2022 | $17,780 | $0 | $856,186 | $725,012 | | $831,841 |
| **TOTAL** | **$95,180** | **$0** | **$3,227,500** | **$2,666,309** | **$94,076** | **$3,187,981** |

17.     2nd Milk purchased different types of nutrition for Malawian children primarily from local Malawi grocery stores and markets. Supplemental nutrition included items like "phala," and "porridge." On one occasion in June 2022, 2nd Milk purchased a bulk shipment of formula from Provider-1 in South Africa for approximately $20,000.

18.     Bank OZK, Arvest Bank, and Signature Bank of Arkansas ("Signature Bank") are financial institutions operating in and with branches located within the Fayetteville Division of the Western District of Arkansas.

**COUNT ONE**
**Conspiracy to Commit Wire Fraud**
**18 U.S.C. § 1349**

19.     Paragraphs 1 through 18 are re-alleged and incorporated by reference as though fully set forth herein.

4

20.     From at least as early as November 2015 through at least March 2024, in the Western District of Arkansas, Fayetteville Division, and elsewhere, the defendants, **JASON CARNEY** and **LACEY CARNEY**, and others known and unknown to the grand jury, did knowingly and unlawfully conspire, confederate, and agree together, and with each other, to commit offenses against the United States, that is to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18 United States Code, Section 1343.

## Purpose of the Scheme

21.     It was the purpose and object of the scheme for **JASON CARNEY** and **LACEY CARNEY,** to unlawfully enrich themselves by stealing, obtaining by fraud, and without authority knowingly converting to their own use, donations made to 2nd Milk by donors who intended the money and property be used for 2nd Milk's charitable purposes.

22.     It was also the purpose and object of the scheme for **JASON CARNEY** and **LACEY CARNEY** to conceal the scale of the diversion of funds by making misleading and false claims to donors regarding the disposition of the charitable donations, and the amount and sources of their personal income.

## Manner and Means

23.     The manners and means by which **JASON CARNEY** and **LACEY CARNEY** carried out the scheme included, but were not limited to:

a.     **JASON CARNEY** and **LACEY CARNEY** solicited donations for 2nd Milk, claiming that those donations supported 2nd Milk's charitable work.

      b.      **JASON CARNEY** and **LACEY CARNEY** instead diverted donations for personal use, including personal travel; payment on home, auto, and boat loans; personal credit accounts; for routine living expenses, discretionary spending, and cosmetic medical procedures.

      c.      At separate times, **JASON CARNEY** represented to donors, potential donors, employees, and board members through email, text messages, and social media posts that he and **LACEY CARNEY** collected both little and no salary from 2nd Milk, while knowing that 2nd Milk donations were a primary source of the **CARNEYS'** personal income.

      d.      **JASON CARNEY** and **LACEY CARNEY** advertised that **LACEY CARNEY** was the CFO and treasurer of 2nd Milk, while she performed no such function for 2nd Milk.

      e.      **JASON CARNEY** selected for 2nd Milk's board of directors individuals with little knowledge and experience of the laws and regulations governing non-profit organizations. The board members received no training on non-profit operations, financial management, and duties. **JASON CARNEY** and **LACEY CARNEY** withheld from the board of directors truthful information about the use of 2nd Milk funds.

      f.      **JASON CARNEY** and **LACEY CARNEY** failed to keep business records for 2nd Milk. 2nd Milk's board of directors were without financial statements, including statement of activities, statement of cash flows, general ledgers, asset lists, donor records, and, importantly, records accounting for **JASON CARNEY** and **LACEY CARNEY's** use of 2nd Milk funds.

g.    **JASON CARNEY** caused to be made publicly available 2nd Milk's IRS Forms 990 that concealed **JASON CARNEY** and **LACEY CARNEY's** use of 2nd Milk's funds by overstating the amounts spent on formula and supplies and omitting and understating the amounts diverted to **JASON CARNEY** and **LACEY CARNEY**.

h.    **JASON CARNEY** prepared, approved, and distributed 2nd Milk materials that exaggerated the scale of 2nd Milk's work and misrepresented the true disposition of the donations.

i.    **JASON CARNEY** and **LACEY CARNEY** diverted 2nd Milk funds for their own personal use in a variety of ways, including:

(1) Using 2nd Milk's operating accounts for personal expenses. This included transferring money from 2nd Milk's accounts to their own personal banking accounts; making payments from 2nd Milk accounts towards their personal credit accounts or for personal expenses; withdrawing 2nd Milk funds as cash for personal use; and depositing 2nd Milk donor checks into their personal accounts.

(2) Creating credit accounts for 2nd Milk, on which **JASON CARNEY** and **LACEY CARNEY** and their relatives charged and allowed to be charged personal expenses, then paying the balances of these accounts with donor funds.

### Overt Acts in Furtherance of the Conspiracy

*I. JASON CARNEY LIED TO DONORS THEN DIVERTED FUNDS TO THE CARNEYS' PERSONAL USE.*

### *Foundation-1 - Donation-1*

24.    On July 26, 2019, **JASON CARNEY** emailed Foundation-1 seeking a 3-year donation of $2,220,000, claiming it would "create nearly $3m per year of net income after Year 3 for 2nd [ ] Milk, over 500 jobs for the local communities, and would produce over 64 million eggs per year[,]…provide the best private Christian education for over 5,000 orphaned children" and

"would allow 2nd [ ] Milk to add over 4,000 malnourished orphaned babies to our program in the first 10 years."

25.     **JASON CARNEY** deposited Foundation-1's $20,000 donation on October 11, 2019, into 2nd Milk's Arvest Bank account ending in #0304.  On October 11, 2019, **JASON CARNEY** emailed an Arvest Bank employee: "Can one of you transfer $2150 from my 2nd Milk savings ending in 0304 to my personal 4125 today?  And tomorrow send $5,000 to my personal from the same account once the money clears?"

26.     After receiving notice of an initial $20,000 donation from Foundation-1, **JASON CARNEY** emailed Foundation-1 on October 19, 2019: "It's going for our chicken house project and the $20,000 will create about 2 jobs per year and produce around $5000 net for the ministry.  Isn't actually a chicken house but our storage building to make our own feed.  It was very much needed.  Plus a fence and bought more land for the next group of chicken houses."

27.     **JASON CARNEY** spent part of Foundation-1's donation on the **CARNEYS'** personal credit accounts and transfers to the **CARNEYS'** personal bank accounts.

### *Foundation-1- Donation-2*

28.     On August 18, 2020, **JASON CARNEY** sent an email to Foundation-1 requesting a donation for $227,000 to fund 6 new chicken houses, vehicles, a fresh water well, and $25,000 in formula purchases.  On December 17, 2020, **JASON CARNEY** sent an email to Foundation-1 that included an updated donation request, noting 2nd Milk's greatest need was for $50,000 to support two new chicken houses.

29.     On December 27, 2020, Foundation-1 emailed **JASON CARNEY**: "We met this morning and would love to support formula/ nutrition needs with a donation of $20,000." **JASON CARNEY** responded: "Awesome! That will be a huge blessing for so many babies."

30.     **JASON CARNEY** received Foundation-1's $20,000 donation on January 28, 2021, which was deposited into 2nd Milk's Arvest Bank account ending in #8395. **JASON CARNEY** spent Foundation-1's $20,000 donation on personal expenses including payments on the **CARNEYS'** personal credit accounts, transfers to the **CARNEYS'** personal bank accounts, and transfers to family members.

### *Foundation-1- Donation-3*

31.     On December 23, 2022, **JASON CARNEY** emailed Foundation-1 seeking support for 2nd Milk projects including $25,000 for a piggery, $50,000 for a chicken house, and $100,000 for a "container of formula."

32.     Foundation-1 authorized a $20,000 donation on this request. **JASON CARNEY** deposited Foundation-1's $20,000 donation into 2nd Milk's Arvest Bank account ending in #8395 on January 19, 2023.

33.     On July 21, 2023, **JASON CARNEY** emailed Foundation-1: "We used $16,000 for formula that we bought directly from the manufacture[r] in South Africa and had transported to Malawi. . .We also built 2 new water wells for 2 different villages." However, 2nd Milk purchased the bulk formula from Provider-1 in June of 2022 for approximately $20,000, six months before receiving Foundation-1's donation. **JASON CARNEY** concealed that he had spent part of Foundation-1's donation on payments toward the **CARNEYS'** personal credit card accounts.

### *Foundation-1- Donation-4*

34.     On November 28, 2023, **JASON CARNEY** texted Foundation-1: "Hey did we miss the opportunity to ask for a grant for this year? I've been gone and somehow missed my calendar entry on getting some things to you[.]"

35.    On that same date, Foundation-1 indicated it would provide another $20,000 donation, to which **JASON CARNEY** replied: "Probably going to use for a container of formula from South Africa to Malawi but will let you guys know."

36.    **JASON CARNEY** received Foundation-1's $20,000 check not later than December 22, 2023, and provided the check to Attorney-1 for deposit into Attorney-1's account. Regarding the donation, **JASON CARNEY** texted Attorney-1: "I just have to keep some money back for us, 2nd Milk, and you. . . I mean I could give you the $20,000 check today. Just need to wire some to Malawi and some needs to go to us to pay bills asap so we don't get behind[.]"

37.    On December 26, 2023, Foundation-1's check was deposited into Attorney-1's account ending in #1577.  On December 28, 2023, **JASON CARNEY** deposited a check for $5,000 from Attorney-1 into **JASON CARNEY's** Signature Bank account ending in #5854, which **JASON CARNEY** then used for personal expenses.

### *Company-1-Donation-1*

38.    On April 30, 2020, **JASON CARNEY** emailed Company-1 seeking "$5,000 for a truckload of baby formula. . . A truckload of formula will allow us to buy 1186 tins of formula . . . and this is enough formula to save the lives of 300 [ ] unsponsored babies until they can find a sponsor through our program."

39.    On May 15, 2020, a Company-1 employee emailed **JASON CARNEY** alerting him that Company-1 would be donating "6,000.00 to help purchase formula!" to which **JASON CARNEY** replied: "Wow I love this! Thankful to say the least!"

40.    **JASON CARNEY** deposited Company-1's $6,000 check into 2nd Milk's Arvest Bank account ending in #1514 on May 22, 2020.  **JASON CARNEY** spent part of Company-1's

$6,000 donation on payments toward the **CARNEYS'** personal credit accounts and other personal expenses.

### *Company-1-Donation-2*

41.    On April 15, 2021, Company-1 emailed **JASON CARNEY**: "Please think of a project or a few projects that we could partner with . . . We do not do monthly support or salary support.  We love to get to partner in specific projects within your ministry[,]" to which **JASON CARNEY** responded "Yes sir!  We will get that over to you this coming week!"

42.    On April 23, 2021, **JASON CARNEY** emailed a Company-1 representative seeking a donation for "50,000 for a 4 x 4 vehicle for staff in Malawi. . . To date we are feeding over 850 babies daily and hope to grow and reach more and more families every day saving lives!"

43.    **JASON CARNEY** knew that statement was false because on December 21, 2020, **JASON CARNEY** texted a 2nd Milk employee. "Hey how many total babies you think we currently have in the program getting formula.  Or that should?"  The employee later responded: "We have 56 right now [i]n [t]he program."

44.    **JASON CARNEY** further knew the statements were false because on July 19, 2021, **JASON CARNEY** sent a message to 2nd Milk's board members: "When we say we feed 1000 kids a month or whatever it doesn't mean different kids.  It's the same for 6 years for those in the program [a]nd our new feeding centers are just hundreds and hundreds in the villages that are there and available to eat."

45.    **JASON CARNEY** deposited Company-1's $50,000 check into 2nd Milk's Arvest Bank account ending in #8395 on May 27, 2021.  **JASON CARNEY** spent part of Company-1's $50,000 donation on the **CARNEYS'** personal credit accounts, transfers into the **CARNEY's** personal bank accounts, and personal vehicle maintenance.

### *Company-1-Donation-3*

46.    On April 4, 2022, **JASON CARNEY** sought from Company-1 a donation of "$60,000 for a container of formula, including transport to Malawi from South Africa" and "$50,000 to drill 25 wells in Malawi Africa[,]" and noted that "Over the past 7 years we have given almost 3 million bottles of formula to orphaned infants, feed over 1000 orphans each day[.]"

47.    On April 4, 2022, **JASON CARNEY** told Company-1: "As far as formula funding for the $100,000 container we had someone give $20k.  That brought us down to $80,000." Company-1 replied "We were thinking full $50k for wells and partial toward the formula. Probably $30k."  On April 29, 2022, Company-1 confirmed to **JASON CARNEY:** "We decided to give 2nd Milk $80,000 for the container of formula and wells!"

48.    **JASON CARNEY** deposited Company-1's $80,000 check on June 6, 2022, into 2nd Milk's Arvest Bank account ending in #8395.  **JASON CARNEY** spent part of Company-1's $80,000 on payments toward the **CARNEYS'** personal credit accounts, transfers into the **CARNEY's** personal bank accounts, and cash withdrawals.

### *Individual-1- Donation-1*

49.    In 2019, **JASON CARNEY** solicited from Individual-1 a donation for a construction project in Malawi.  **JASON CARNEY** deposited Individual-1's $30,000 check into 2nd Milk's Bank OZK account ending in #0670 on February 27, 2019.  Prior to the deposit, the balance of the account was $3,258.61.

50.    On March 1, 2019, **JASON CARNEY** emailed a Bank OZK employee: "Forgot I needed to come by Friday and get $16k cash from the 2nd Milk account.  What time do you guys think this could be ready?"  That same day, **JASON CARNEY** withdrew $16,000 from the 2nd Milk account ending in #0670.

51.     On March 5, 2019, **JASON CARNEY** purchased a 2010 Toyota FJ Cruiser for $15,000 in cash for his child.

### *Individual 1- Donation-2*

52.     In January 2020, Individual-1 donated $15,000 to 2nd Milk again for a construction project in Malawi.  **JASON CARNEY** deposited Individual-1's $15,000 check into 2nd Milk's account ending in #0304 on January 27, 2020.

53.     **JASON CARNEY** spent part of Individual-1's $15,000 donation on the **CARNEYS'** personal credit account and on the **CARNEYS'** mortgage on their primary residence.

### *Individual 1- Donation-3*

54.     On April 1, 2021, **JASON CARNEY** texted Individual-1: "Still thinking stock gift?"

55.     On April 5, 2021, E.C., a relative of **JASON CARNEY**, texted **JASON CARNEY**: "What's the deal with a motorcycle?" to which **JASON CARNEY** responded: "Still waiting on this guy to message me back about the donation[.]  I just texted him again.  He typically takes three or four days to respond and I texted him on the first."

56.     On April 13, 2021, **JASON CARNEY** texted E.C.: "The guy donating stock finally reached out.  Only giving $10k.  Was hoping for $30k.  But I'm setting up account for him to give stock now then can look at them."

57.     On April 30, 2021, **JASON CARNEY** texted Individual-1: "We are finally set up to accept stock!"

58.     On May 17, 2021, **JASON CARNEY** deposited a check from Individual-1 for $10,039.62 into 2nd Milk's Arvest Bank account ending in #8395.

59.    On May 18, 2021, **JASON CARNEY** emailed an Arvest Bank employee: "Can you guys transfer $1500 from 8395 over to [E.C.'s] account 7258 which is his savings?"

60.    On May 18, 2021, $1,500 was transferred from the 2nd Milk Arvest account ending in #8395 to E.C.'s Arvest account ending in #7258, which E.C. used towards the purchase of a Honda motorcycle on May 19, 2021.

### *Individual 1- Donation-4*

61.    On December 22, 2023, Individual-1 donated shares of stock worth approximately $12,700 to support 2nd Milk's charitable purposes.

62.    On December 27, 2023, **JASON CARNEY** emailed a fundraising-website employee regarding Individual-1's donation: "Did the stock gift come through already?  Any updates on this would be appreciated.  And how much was it?  We really need those funds asap if possible."

63.    On January 12, 2024, **JASON CARNEY** emailed a fundraising-website employee regarding Individual-1's donation: "Can we get this sent to our bank asap please?  It's been over 2 weeks since you received. . . We have to be able to show impact and can't do that if we don't receive funds quickly.  Can you go ahead and send this to our account today or tomorrow please?"

64.    On January 23, 2024, **JASON CARNEY** deposited a check containing Individual-1's gift of stock into Signature Bank account ending in #6677.  **JASON CARNEY** spent part of Individual-1's donation on the **CARNEYS'** personal credit accounts.

### *Company-2 – Donation-1*

65.    On June 23, 2020, Company-2 donated $25,000 to 2nd Milk for a construction project in Malawi. **JASON CARNEY** deposited Company-2's $25,000 donation into 2nd Milk's Arvest Bank account ending in #1514 on June 23, 2020.

66.     **JASON CARNEY** spent part of Company-2's $25,000 donation on the **CARNEYS'** personal credit accounts and transfers into the **CARNEY's** personal bank accounts.

### *Company-2 – Donation-2*

67.     On September 3, 2020, Company-2 donated $4,167.00 to support 2nd Milk's charitable programs. On the same date, **JASON CARNEY** deposited Individual-1's check into 2nd Milk's Arvest account ending in #9541. **JASON CARNEY** transferred part of Individual-1's donation to the **CARNEYS'** personal account.

### *II.     JASON CARNEY LIED ABOUT HIS USE OF 2nd MILK FUNDS.*

68.     **JASON CARNEY** told donors, potential donors, and board members that he received little or no money from 2nd Milk, while knowing his statements were false and fraudulent.

69.     Examples of **JASON CARNEY's** false statements include, but are not limited to:

a.     On July 21, 2017, **JASON CARNEY** emailed a 2nd Milk donor: "For every dollar 82 cents goes to babies today. As we grow our number is projected at 92-93. The rest goes for overhead which includes staff and rent in Africa."

b.     On May 22, 2018, **JASON CARNEY** emailed a potential donor: "First off I'm the president of 2nd Milk and have never taken a salary. All of the funds go directly to the children."

c.     On June 27, 2018, **JASON CARNEY** posted a video to Facebook, saying**:** "the one thing that we really pride ourselves in, if you can say that, as humbly as I can say that is that we don't take a salary from 2nd Milk. So as you guys are sponsoring babies, that money goes specifically for the babies." And: "[h]ow [is it] that the Carneys are able to afford the six children that we have and continue managing all the hundreds of children and lives that we're touching in Africa. . . But, I think it's important to know that the

Carneys are not taking your money when you sponsor babies, all that money goes specifically for those babies."

      **d.**      On November 20, 2019, **JASON CARNEY** emailed a 2nd Milk employee regarding 2nd Milk's end of year update: "$497,542, was last year . . . 96% of these funds went to babies in Africa.  4% of these funds went to our staff and overhead in Africa."  On November 21, 2019, 2nd Milk's Instagram page posted the "End of Year Update" that included: "2nd Milk is committed to fiscal responsibility and transparency[,]" and that "96% of funds went to our babies in Africa" and "4% went to staff and overhead in Africa[.]"

      **e.**      On September 3, 2020, **JASON CARNEY** texted a 2nd Milk board member: "Well just so you know I haven't taken any of 2nd Milks money.  Do I get paid through 2nd Milk? Yes. Am I even afraid to pay my phone bill with 2M money. Yes! Haha[.]" Meanwhile, on September 14, 2020 **JASON CARNEY** emailed Accountant-1: "Also how does it work if some of our expenses were covered by 2nd Milk like phone bills and such?"

      **f.**      On October 20, 2020, **JASON CARNEY** caused 2nd Milk's Facebook page to post: "Every dollar donated goes directly to the formula program!"

      **g.**      On November 12, 2020, **JASON CARNEY** caused 2nd Milk's Facebook page to post that "Every single dollar given goes to babies like [redacted] who are in need of nutritional support."

      **h.**      On November 23, 2021, **JASON CARNEY** texted a 2nd Milk employee regarding 2nd Milk's executive summary:

"Use these numbers for our financials

Overall revenue - $419,076
Overhead 11.9% (can call it whatever)
17.8% mission trip funds (flights, accommodations for teams, transport)
70.3% for babies

Inside of that 70.3% it looks like this
Formula, local staff, Phala, medical transport, clothes, and such
Think you can work with this? Obviously we want to make it look positive."

    **i.**    On February 14, 2021, **JASON CARNEY** caused 2nd Milk's Facebook page to post that "Every dollar given goes right back into saving the lives of orphaned and malnourished babies in the formula program."

    **j.**    On December 17, 2022, **JASON CARNEY** texted a potential donor: "But my zero income was zero from 2nd Milk. I own 4 other companies. Duh . . .Just tell [redacted] you know that I have 3 or more other businesses and that I don't take a salary from 2nd Milk like we used to in the early years, And that wouldn't be reported on the 990 but on his personal taxes since his other businesses have nothing to do with 2nd Milk[.]"

III.    *JASON AND LACEY CARNEY MISREPRESENTED LACEY CARNEY'S ROLE.*

**70.**    2nd Milk tax filings and marketing materials falsely portrayed to the public that **LACEY CARNEY** served as 2nd Milk's CFO, treasurer, and board member, despite **JASON CARNEY**, **LACEY CARNEY,** and others knowing that **LACEY CARNEY** performed no such function.

**71.**    While **LACEY CARNEY's** role with 2nd Milk was limited to items like clerical work and event planning, she benefitted from 2nd Milk donor funds for her personal salary.

    **a.**    On October 20, 2021, **LACEY CARNEY** cosigned an Arvest Bank loan application to purchase a 2021 Tracker fishing boat and trailer. The application listed **JASON CARNEY's** employer as "2nd Milk" with a monthly income of $17,458.33 and **LACEY CARNEY** with employer "2nd Milk," and a monthly salary of $17,458.33. Neither listed any other employer or source of income.

b.      On October 27, 2021, **LACEY CARNEY** co-signed an Ally Bank loan application for a 2020 Toyota Tundra.  The loan application listed **JASON CARNEY's** employer and title as "2nd Milk" and "President" with annual income of $208,000. **LACEY CARNEY's** employer and title were "2nd Milk" and "CFO" with annual income of $208,000.  Neither listed any other employer or source of income.

c.      On February 11, 2022, **JASON CARNEY** and **LACEY CARNEY** co-signed an Arvest Bank loan application 2421189 to purchase a 2020 Dodge Ram.  The loan application listed **JASON CARNEY's** employer as "2nd Milk" with a monthly income of $17,458.33 and **LACEY CARNEY,** with employer "2nd Milk," and monthly salary of $17,458.33.  Neither listed any other employer or source of income.

d.      On May 2, 2022, **LACEY CARNEY** cosigned an Arvest Bank application for a home equity line of credit.  The loan application listed **JASON CARNEY's** employer as "2nd Milk" with a monthly income of $17,458.33 and **LACEY CARNEY**, with employer "2nd Milk," and a monthly salary of $17,458.33.  Neither listed any other employer or source of income.

72.     **LACEY CARNEY** spent 2nd Milk donor funds on personal expenses.

a.      On February 17, 2020, following a donation to 2nd Milk, **JASON CARNEY** emailed an Arvest Bank employee: "Can you transfer $4300 from 2nd Milk 1514 over to my personal 4125 please?"  The Arvest employee completed this transaction as requested. The balance of the **CARNEYS'** account ending in 4125 was about $1200.00 before this transfer.

      b.      On February 18, 2020, **LACEY CARNEY** remitted a check from the **CARNEYS'** Arvest account ending in #4125, in the amount of $4,279.00 to Clinic-1, as payment for a cosmetic surgery procedure.

*IV.    THE CARNEYS KNEW THEIR SALARY ASSERTIONS WERE FALSE.*

**73.**    Despite **JASON CARNEY** representing that he received little or no income from 2nd Milk, **JASON CARNEY** and **LACEY CARNEY** knew that 2nd Milk funds were a primary source of income.

      a.      On September 22, 2015, **JASON CARNEY** emailed a Bank OZK employee: "Because we are paid when we get money that comes in vs just a regular salary each month I'm not sure how much we are getting paid on average.  Would you mind letting me know how much for deposits we had on our personal account each month from April through September so far? (Like separated by each month)[.]"

      b.      On September 22, 2015, the Bank OZK employee responded: "Jason, Here are the total deposits for your personal account.

| | |
|---|---|
| April | $18,714.50 |
| May | $8,136.75 |
| June | $11,078.73 |
| July | $17,670.00 |
| August | $11,240.00 |
| September | $4,000.00 |

Overall total of deposits and transfers $70,939.98
Average monthly total is $11,823.33"

      c.      **JASON CARNEY** responded that same day: "Maybe I need to get online and look at statements or something because I had no idea we had this much for deposits each month.  Is it a running total or something or actual deposits split up for each month?"

      d.      On March 25, 2022, **JASON CARNEY** emailed an Arvest Bank employee regarding the **CARNEYS'** income for loan application purposes:  The employee asked:

"Stated income still $500k annually (jointly) for self employment at 2nd Milk?" **JASON CARNEY** responded: "It's gross total income for 2nd Milk jointly. Not each. [**LACEY CARNEY**] does have another job as well with interior design but it's around $25k per year[.]"

      **e.**      On July 6, 2023, **JASON CARNEY** texted an Arvest Bank employee: "Since our income is weird with 2nd Milk how do you want me to put that on the app per month? We bring in over a million per year with everything. But not sure I really count that as personal income[.]

      **f.**      On January 3, 2024, **JASON CARNEY** completed a personal credit application with American Express that stated his annual income was $200,000.

     *V.*      *THE CARNEYS' DIVERTED 2nd MILK DONOR FUNDS.*

  *a.*  *The Carneys used 2nd Milk credit accounts for personal expenses and paid them with donor funds.*

      **74.**      In November 2015, **JASON CARNEY** and **LACEY CARNEY** obtained an American Express Business Gold Rewards account in the name of Second Milk Inc., with cards ending in #71004 belonging to **JASON CARNEY** ("**JASON's** card"), #71012 and 72010 belonging to **LACEY CARNEY** ("**LACEY's** cards"), and #71020 and #71038 belonging to their relatives ("**CARNEY's** relatives' cards").

      **75.**      Between November 2015 and October 2016, **JASON**'s card made more than $120,000 in purchases, including personal expenses such as international cruise tickets for the Carney family, clothing, and restaurants.

      **76.**      Between November 2015 and October 2016, **LACEY**'s cards made more than $25,000 in purchases, including, but not limited to, event tickets, furniture, dental bills, and restaurants.

77.    Between November 2015 and October 2016, the **CARNEYS'** relatives' cards made more than $8,000 in purchases, including fast food purchases, fuel, cinema tickets, and apparel.

78.    Beginning again in January 2024 through July 2024, **JASON CARNEY** obtained from American Express a credit card ending in #1006 in the name of 2nd Milk, Inc., and a credit card ending in #1009 in the name of 2nd Milk, LLC. **JASON CARNEY** used these cards for more than $18,000 of purchases, including airfare to Asia, auto repairs, and medical bills.

*b.    The CARNEYS used 2nd Milk funds to pay personal credit balances.*

79.    **JASON CARNEY** directed more than $900,000 from 2nd Milk's operating accounts to pay balances on personal American Express credit accounts ending in #1004 and #2002.

*c.    The CARNEYS used 2nd Milk operating accounts for personal expenses.*

80.    Excluding payments to personal credit accounts and direct funds transfers to the **CARNEYS,** the **CARNEYS** spent more than $300,000 from 2nd Milk operating accounts at Bank OZK, Arvest Bank, and Signature Bank for personal expenditures including apparel, furniture, vacation rentals, auto insurance, auto maintenance, spa visits, and restaurants.

*d.    The CARNEYS transferred 2nd Milk funds to their personal accounts.*

81.    The **CARNEYS** caused to be transferred from 2nd Milk operating accounts at least $500,000 to personal accounts under their control.

82.    On more than 100 occasions**, JASON CARNEY** emailed Bank OZK and Arvest Bank employees and directed them to move money from 2nd Milk operating accounts to accounts under the **CARNEYS'** control.

a.      On July 30, 2015, **JASON CARNEY** emailed a Bank OZK employee: "Can you transfer $8000 from 2nd Milk to my personal please?" The Bank OZK employee completed this transaction as requested.

b.      On February 17, 2016, **JASON CARNEY** emailed a Bank OZK employee: "Would you mind moving $1000 over to my personal please?" The Bank OZK employee completed this transaction as requested.

c.      On September 3, 2019, **JASON CARNEY** emailed an Arvest Bank employee: "Can you transfer $4000 from the 2nd Milk account to the 4125 account by chance?" The Arvest employee completed this transaction.

d.      On October 23, 2020, **JASON CARNEY** emailed an Arvest Bank employee: "Can you send [E.C.] $500 from The 2nd Milk account ending in 8395 to his account ending in 7216[.]" The Arvest employee completed this transaction as requested.

e.      On November 1, 2021, **JASON CARNEY** emailed an Arvest Bank employee: "Can we transfer $4500 from 1514 to my personal 4125 please?" The Arvest employee completed this transaction as requested.

f.      On June 7, 2022, **JASON CARNEY** emailed an Arvest Bank employee: "Hey could one of you transfer some funds for me? I'm not sure who is in the office today[.] 2nd Milk account 8395 to personal 4125 - $8000[.] 8395 to the HELOC account 0905 - $10,000 please[.]" The Arvest employee completed this transaction as requested.

g.      On July 19, 2022, **JASON CARNEY** emailed an Arvest Bank employee: "Could someone transfer $5000 from 2nd Milk account 8395 over to our HELOC account please?" The Arvest employee completed this transaction as requested.

      **h.**     On July 10, 2023, **JASON CARNEY** emailed an Arvest Bank employee: "Hey [redacted] can you transfer $5000 from 8395 to 4125 please?" The Arvest employee completed this transaction as requested.

## VI.    *JASON CARNEY FALSELY REPRESENTED ITS USE OF DONOR MONEY.*

**83.**    In 2017, **JASON CARNEY** engaged Accountant-1 to prepare 2nd Milk's annual tax filings and the **CARNEYS**' personal taxes. **JASON CARNEY** failed to provide Accountant-1 with materials to prepare 2nd Milk's taxes truthfully, and provided Accountant-1 with false and misleading information, including:

      **a.**     On April 26, 2017, **JASON CARNEY** emailed Accountant-1: "Pretty sure [2nd Milk] had around $116k come in for last year. But need to check. Not less for sure[.]"

      **b.**     When Accountant-1 sought records, **JASON CARNEY** responded on November 14, 2017: "Not sure we have much. Let me ask the girl that has been helping us a little. What would she need to run out of quickbooks if she has stuff already?" When Accountant-1 requested "a standard profit & loss and a standard balance sheet[,]" **JASON CARNEY** responded "Nope. Only entered some stuff for 2017 through July. So what can you do for us??"

      **c.**     On November 15, 2017, **JASON CARNEY** emailed Accountant-1 concerning 2nd Milk's annual expenses: "Lots of trips to Africa so travel expenses throughout the year. At least 5 trips in 2016 I think. Usually cost about $6-8k per trip. Biggest cost is formula. Probably 80% of that money went to buy formula and bottles for babies. Rest mainly spent on staff salaries in Africa (locals not Americans) and rent for offices."

    **d.**    On May 23, 2019, **JASON CARNEY** emailed Accountant-1 "I did take some from 2nd Milk last year.  Was $6,207.14."

    **e.**    On August 3, 2020, **JASON CARNEY** emailed Accountant-1: "Made the same last year from 2nd Milk[.]  What else do you need?"

    **f.**    On September 14, 2020, **JASON CARNEY** emailed Accountant-1: "[W]hen I said same as last year I guess I really meant like home taxes paid and such.  I thought we had around 50k from 2nd Milk so that's what I was speaking of. . . In 2019 all year we got $4166.67 monthly."

    **g.**    On November 13, 2020, in response to Accountant-1's reminder that 2nd Milk's tax filings were due on November 15, 2020, **JASON CARNEY** emailed Accountant-1: "Oh crap!  Let me send you all of the bank statements for 2019 shortly because I'm in Africa and may take me a minute[.]"

    **h.**    On May 6, 2021, **JASON CARNEY** emailed Accountant-1: "So everything same as last year except Lacey worked some."

    **i.**    On November 15, 2021: **JASON CARNEY** emailed Accountant-1, regarding he and **LACEY CARNEY's** 2nd Milk salary: "For personal use we took a salary of around $64k I think[.]"

    **j.**    On November 2, 2022, **JASON CARNEY** emailed Accountant-1: "I guess we have to have all of our personal and 2nd Milk taxes completed by the 15th.  What all do you need to get those done?"

    **k.**    On November 15, 2022, **JASON CARNEY** emailed Accountant-1 "I made $43,680 from [Carney-Business-1], $12,540 from [Carney-Business-2] and $13,400 from 2nd Milk[.]  Plus whatever Lacey made[.]"

      **l.**     On September 11, 2023, **JASON CARNEY** emailed Accountant-1 "Also on top of whatever income you have for Lacey and I we also have some 2nd Milk income of $42,560[.]"

**84.**    **JASON CARNEY** repeatedly referenced 2nd Milk's public tax documents to donors and prospective donors, knowing that they contained false information:

      **a.**     On February 25, 2018, **JASON CARNEY** emailed a potential donor: "Anyway, last year we realized we needed to create better financial accountability even outside our board. So we signed up with Guide Star. We can upload our 990 to show our financials to the world each year and in 2018 we plan to adopt a few other non profits that help show financial accountability as well . . . A lot of believers that run non-profits seem to 'hide' behind the word Christian to hide what they are doing. We don't want to be an organization like that. And so far we have always spent all of our sponsorships and donations on the babies. I haven't even taken a salary. . . Maybe one day I will consider it ok to go full time with 2nd Milk. Maybe one day someone will just want to help with my salary:) (dreaming I know haha)."

      **b.**     On June 14, 2020, **JASON CARNEY** texted Company-2: "And yes we do our 990 returns each Nov 15th for non profits. It's already online so nothing to hide:)"

      **c.**     On June 16, 2021, **JASON CARNEY** emailed a donor a copy of 2nd Milk's 2019 Form 990: "We are praying you will continue to support the work at 2nd Milk! Also our taxes are done each Nov for the year prior so right now we have 2019 completed which I'm sending to you."

      **d.**     On September 19, 2023, **JASON CARNEY** texted Foundation-1 "Our CPA does a form 990 every year in Nov. So he is about to complete 2022 I think coming

up. Let me send you the last one he did[.]" **JASON CARNEY** texted a copy of 2nd Milk's 2021 Form 990 to Foundation-1 that same day.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2 - 12**
**Wire Fraud**
**18 U.S.C. § 1343**

**The Scheme to Defraud**

**85.** Paragraphs 1 through 84 are incorporated and realleged herein.

**86.** From at least as early as May 2015 until at least November 2024, the defendant, **JASON CARNEY**, and others known and unknown to the grand jury, knowingly devised and intended to devise a scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations and promises.

**Execution of the Scheme**

**87.** On the dates listed below, in the Western District or Arkansas and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud, and attempting to do so, the defendant **JASON CARNEY** did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, the writings, signals, and sounds described below, each transmission constituting a separate count.

| COUNT | DATE | WIRE COMMUNICATION |
|:---:|:---|:---|
| Counts Regarding Foundation-1 | | |
| 2 | January 28, 2021 | Settlement of check 0171034, in the amount of $20,000 from Foundation-1, deposited to 2nd Milk's Arvest Bank account ending in 8395. |
| 3 | January 19, 2023 | Settlement of check 0286463, in the amount of $20,000 from Foundation 1's deposited to 2nd Milk's Arvest Bank account ending in 8395. |
| 4 | December 26, 2023 | Settlement of check 0001495, in the amount of $20,000 from Foundation-1, deposited into Attorney-1's account ending in 1577. |

| | | Counts Regarding Company-1 |
|---|---|---|
| 5 | May 22, 2020 | Settlement of check 19504 from Company-1 in the amount of $6,000 into 2nd Milk's Arvest Bank account ending in 1514. |
| 6 | May 26, 2021 | Settlement of check 22323 from Company-1, in the amount of $50,000, deposited to 2nd Milk's Arvest Bank account ending in 8395. |
| 7 | June 6, 2022 | Settlement of check 4085, in the amount of $80,000 from Company-1 into 2nd Milk's Arvest Bank account ending in 8395. |
| | | Counts Regarding Individual-1 |
| 8 | January 27, 2020 | Settlement of check 1945, in the amount of $15,000 from Individual-1, deposited to 2nd Milk's Arvest Bank account ending in 0304. |
| 9 | May 17, 2021 | Settlement of check 11689656, in the amount of $10,039.62 from Individual-1, deposited into 2nd Milk's Arvest Bank account ending in 8395. |
| 10 | January 23, 2024 | Settlement of check 0750039998, in the amount of $13,891.84 from Arvest Bank, deposited to 2nd Milk's Signature Bank account ending in 6677. |
| | | Counts Regarding Company-2 |
| 11 | June 23, 2020 | Settlement of check 89315 in the amount of $25,000 from Individual-1, deposited into 2nd Milk's Arvest Bank account ending in 1514. |
| 12 | September 3, 2020 | Settlement of check 89701, in the amount of $4,167.00 from Company-2, deposited to 2nd Milk's Arvest Bank account ending in 9541. |

All in violation of Title 18, United States Code, Section 1343.

## COUNT 13
### Structuring Transactions to Evade Reporting Requirements
### 31 U.S.C. § 5324

On February 25, 2022, in the Fayetteville Division of the Western District of Arkansas, the defendant, **JASON CARNEY**, for the purpose of evading the currency transaction reporting requirements imposed upon domestic financial institutions, did knowingly structure, attempt to structure, and assist in structuring his transactions with one or more domestic financial institutions by engaging in the following transactions.

| Transaction type | Date | Amount | Account |
|---|---|---|---|
| Cash withdrawal | February 25, 2022 | $4,000 | Arvest Bank account ending in 0304 |
| Cash withdrawal | February 25, 2022 | $8,000 | Arvest Bank account ending in 1514 |
| Cash withdrawal | February 25, 2022 | $6,000 | Arvest Bank account ending in 4125 |

All in violation of Title 31, United States Code, Section 5324(a)(3).

## COUNT 14
### Structuring Transactions to Evade Reporting Requirements
### 31 U.S.C. § 5324

From February 20, 2023, through February 21, 2023, in the Fayetteville Division of the Western District of Arkansas, the defendant, **JASON CARNEY**, for the purpose of evading the currency transaction reporting requirements imposed upon domestic financial institutions, did knowingly structure, attempt to structure, and assist in structuring his transactions with one or more domestic financial institutions by engaging in the following transactions.

| Transaction type | Date | Amount | Account |
|---|---|---|---|
| Cash withdrawal | February 20, 2023 | $9,000 | Arvest Bank account ending in 8395 |
| Cash withdrawal | February 21, 2023 | $9,000 | Arvest Bank account ending in 8395 |

All in violation of Title 31, United States Code, Section 5324(a)(3).

## COUNT 15
### Structuring Transactions to Evade Reporting Requirements
### 31 U.S.C. § 5324

On May 22, 2023, in the Fayetteville Division of the Western District of Arkansas, the defendant, **JASON CARNEY**, for the purpose of evading the currency transaction reporting requirements imposed upon domestic financial institutions, did knowingly structure, attempt to structure, and assist in structuring his transactions with one or more domestic financial institutions by engaging in the following transactions.

| Transaction Type | Date | Amount | Account |
|---|---|---|---|
| Cash withdrawal | May 22, 2023 | $8,500 | Arvest Bank account ending in 8395 |
| Cash withdrawal | May 23, 2023 | $8,500 | Arvest Bank account ending in 8395 |

All in violation of Title 31, United States Code, Section 5324(a)(3).

## NOTICE OF FORFEITURE

The Grand Jury re-alleges and incorporates by reference herein Counts 1 through 12 of this Indictment.

Upon conviction of Counts 1 through 12, of this Indictment, the Defendants, **JASON CARNEY** and **LACEY CARNEY**, shall forfeit to the United States pursuant Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, which constitutes or is derived from proceeds traceable to the offense, including, but not limited to, the following specific property:

A. The Property located at 446 Angel Falls Lane, Springdale, Arkansas 72762, more particularly described as:

LOT 15, THE FALLS SUBDIVISION, TO THE CITY OF SPRINGDALE, WASHINGTON COUNTY, ARKANSAS, AS SHOWN ON FINAL PLAT RECORD "23A" AT PAGE 244

A True Bill.

DAVID CLAY FOWLKES
UNITED STATES ATTORNEY

*/s/ Grand Jury Foreperson*
Grand Jury Foreperson

Hunter Bridges
Assistant U.S. Attorney
Arkansas Bar No. 2012282
414 Parker Avenue
Fort Smith, AR  72901
(479) 783-5125
Hunter.Bridges@usdoj.gov